**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| PALMAS FUEL CORP.<br>Plaintiff<br><br>v.<br><br>PUERTO RICO ENERGY, LLC<br>Defendants | Civil Case No.: |

**VERIFIED COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF UNDER THE PETROLEUM MARKETING PRACTICES ACT (15 U.S.C. §§ 2801 ET SEQ.), AND FOR DAMAGES AND RESTITUTION**

**TO THE HONORABLE COURT:**

Plaintiff Palmas Fuel Corp. ("Palmas"), through undersigned counsel, alleges as follows against Defendant Puerto Rico Energy, LLC ("PRE"):

## I. NATURE OF THE ACTION

1. This is an action under the Petroleum Marketing Practices Act ("PMPA"), 15 U.S.C. § 2801 et seq., and Puerto Rico law.

2. On October 9, 2026, PRE declared Palmas's franchise for Service Station S/S 332 in Cataño (the "Station") terminated "effective immediately" by letter of that date (the "Notice"), announced the immediate suspension of all fuel orders and deliveries to the Station, and demanded that Palmas surrender "possession and control" of the Station by October 16, 2026.

3. None of PRE's stated grounds permits termination.

4. PRE's conduct here follows a pattern.

5. PRE has also brought actions in this Court arising from its franchise relationships. *Puerto Rico Energy LLC v. Leesan Inv. Corp.*, Civil No. 26-01333 (ADC); *Puerto Rico Energy, LLC v. Marrero-Burgos*, Civil No. 26-01451 (PAD).

6. In *Puerto Rico Energy LLC v. León*, Civil No. 25-01220 (MAJ), consolidated with *Seijo-Marrero v. Puerto Rico Energy, LLC*, Civil No. 25-01222, PRE terminated the franchises and suspended fuel deliveries over alleged environmental violations before the DNER concerning underground storage tanks that PRE owns, Civil No. 25-01220, ECF No. 11-1, at 2–3—tanks of the kind PRE agreed with the EPA in 2011 to bring into compliance. *Leesan*, ECF No. 46-1, ¶ 23.

7. PRE now invokes, against Palmas, a DNER settlement concerning another station.

8. This Court has temporarily restrained PRE from ending a franchise and selling the station premises. *Isla Verde Serv. Station, Inc. v. Puerto Rico Energy, LLC*, Civil No. 25-01655 (MAJ), ECF No. 11 (D.P.R. Dec. 10, 2025).

9. And, in dismissing with prejudice PRE's challenge to Act No. 60 of 2020, this Court noted that it had denied, citing "indicia of bad faith," PRE's request to withdraw some of its claims. *Puerto Rico Energy, LLC v. Commonwealth of Puerto Rico*, Civil No. 20-1591 (ADC), ECF No. 337, at 6, 50 (D.P.R. Mar. 31, 2026), appeal docketed, No. 26-1495 (1st Cir. May 6, 2026).

10. Puerto Rico law exists to prevent that conduct. It protects gasoline retailers from "*posibles prácticas predadoras de parte de compañías mayoristas distribuidoras de gasolina*" (possible predatory practices by wholesale gasoline distributors) and from *toda práctica discriminatoria que pretenda eliminar al detallista individual de gasolina de la competencia del mercado*" (every discriminatory practice that seeks to eliminate the individual gasoline retailer from market competition), and it treats a wholesaler's direct operation of a service station as a predatory practice. *Aguadilla Paint Ctr., Inc. v. Esso Standard Oil Co. (P.R.)*, 183 D.P.R. 901 (2011), 2011 TSPR 194, at 6, 15 (first quotation quoting *Exposición de Motivos*, Act No. 157 of August 21, 1996).

11. PRE itself has told the DNER that Act No. 3 "prohibits wholesale-distributors from directly or indirectly operating a service station and categorizes failure to comply with this mandate as a crime." *León*, ECF No. 11-1, at 3–4.

12. In its October 9, 2026 termination letter, PRE demands the operating business itself: its "permits, licenses, certificates, keys, access codes, alarm codes, tank records, environmental records, inventory records, equipment records," and Palmas's cooperation "in the orderly transition … and recovery of the Station."

13. PRE also forbids Palmas to "sell fuel or conduct any other commercial activity" at the Station, including its convenience store. Ex. 1, at 5–6.

14. PRE lets Palmas take away its inventory and equipment, *id.* at 5, but keeps what makes the Station a going concern—the permits, access, records and continuity that let it open the next day to Palmas's customers—without paying Palmas anything for it.

15. Puerto Rico law allows a wholesaler to operate a station directly only after the retailer stops operating it for causes not attributable to the wholesaler, or after a termination made in accordance with law, for no more than ninety days, and on prior written notice to the Office of Monopolistic Affairs; after that, the wholesaler must either operate the station through a bona fide retailer or cease operating it. Act No. 3, art. 2(c), 23 L.P.R.A. § 1102.

16. PRE thus seeks Palmas's going concern, on grounds that do not belong to Palmas, for a Station that it could not keep operating itself.

17. Palmas seeks a declaration that the franchise was not lawfully terminated and remains in effect; preliminary and permanent injunctive relief, including the immediate restoration of fuel supply; and actual and exemplary damages and attorney's fees under the PMPA.

18. Under Puerto Rico law, Palmas seeks declaratory relief, specific performance, an accounting and judgment, with interest, for the monthly amount charged above the agreed amount,

for fuel invoiced at PRE's delivered dealer price instead of the "Lowest Rack Price" that the Franchise Agreement fixes, and for the percentage of the convenience store's sales that PRE has taken without contractual basis.

19. The documents referenced in this pleading are identified in the accompanying Index of Exhibits (Exhibits 1 through 14) and are incorporated by reference.

20. Palmas does not adopt the truth of statements by PRE contained in them.

21. Palmas requests that the Court take judicial notice of the filings and orders of this Court and of the Puerto Rico Supreme Court cited in this pleading.

## II. CHRONOLOGY

22. The basic chronology is as follows:

**(a)** February 25, 2015 — Palmas and Puma Energy Caribe, LLC (now PRE) execute the Franchise Agreement (Ex. 2).

**(b)** August 19, 2022 — PRE writes that the change to the Texaco brand requires new agreements, at a higher monthly amount and with a royalty on the store's sales (Ex. 8; *infra* ¶¶ 167–168).

**(c)** November 11, 2022 — PRE informs Palmas that it will remove the Puma image and install the Texaco and Star Mart image at the Station on November 13–16, 2022.

**(d)** March 2023 — PRE begins collecting a monthly amount of $12,000 instead of the $10,000 that § 3.1.1 fixes (*infra* ¶¶ 163–173).

**(e)** June 25, 2024 — PRE and Berwin Fuel Corp. terminate Berwin's franchise for Station #017 by mutual consent (Ex. 4).

**(f)** April 15 through September 22, 2026 — According to the Notice, PRE sends written notifications about product availability, while continuing the franchise, supplying fuel and accepting payment (Ex. 1).

**(g)** June 18, 2026 — PRE, as sole respondent, settles a DNER proceeding arising from a 2019 inspection of Station #017 (Ex. 5).

**(h)** September 14, 2026 — PRE sends a $22,500 payment claim, not to Palmas, but to a separate legal entity, concerning a different station. PRE and that entity had terminated their franchise by mutual consent in June 2024, more than two years before PRE asserted the claim.

**(i)** September 16, 2026 — That entity rejects the claim in writing.

**(j)** October 9, 2026 — PRE issues the Notice, declaring the franchise terminated and all deliveries suspended "effective immediately" (Ex. 1); that same day, it delivers and invoices 2,000 gallons of Diesel to the Station (Ex. 6).

**(k)** October 12, 2026 — PRE delivers 6,000 gallons of Regular to the Station, while continuing to treat the franchise as terminated (Ex. 6).

**(l)** October 14–26, 2026 — PRE cancels, without delivering a gallon, the orders Palmas placed on October 14, 15 and 16 for delivery on October 15, 16 and 17; by October 26, PRE's portal lists all three as "Cancelada" (Ex. 6).

**(m)** October 15, 2026 — PRE proposes that Palmas surrender this Station to PRE (*infra* ¶¶ 72–75).

**(n)** October 16, 2026 — The surrender date PRE demanded passes, with Palmas still in possession and PRE no longer supplying the Station.

**(o)** By October 17, 2026 — Without PRE's deliveries, the Station has run out of all motor fuel; it remains open and attended.

**(p)** October 20–25, 2026 — PRE does not collect by ACH the monthly amount for October 2026 (*infra* ¶¶ 174–176).

**(q)** October 21, 2026 — PRE's portal refuses to let Palmas begin a new order, displaying "*No hay localización de entrega activo para este cliente*" (Ex. 6).

**(r)** October 22, 2026 — The Postal Service returns PRE's certified envelope containing the Notice, marked "NO SUCH NUMBER" (Ex. 13).

**(s)** November 4, 2026 — An agent of PRE delivers that envelope and the Notice by hand to Palmas's personnel at the Station (Ex. 13).

## III. PARTIES

23. Plaintiff Palmas Fuel Corp. is a for-profit corporation organized under the laws of Puerto Rico, registered with the Puerto Rico Department of State under No. 347447, with its designated office at Carr. #869, Km. 0.7, Bo. Palmas, Cataño, Puerto Rico, and its mailing address at P.O. Box 50485, Toa Baja, Puerto Rico 00950.

24. Palmas is the franchised retailer at the Station and a "franchisee" and "retailer" under 15 U.S.C. § 2801(4) and (7).

25. Amin Yassin has been Palmas's President since June 2, 2020.

26. Defendant Puerto Rico Energy, LLC, formerly known as Puma Energy Caribe, LLC, is a limited liability company with offices at Professional Office Park III, 996 San Roberto Street, Monacillos Ward, San Juan, Puerto Rico.

27. Puma Energy Caribe, LLC changed its name to Puerto Rico Energy LLC on February 16, 2023. Ex. 5, *Acuerdo Transaccional*, at 1 n.2.

28. PRE supplies motor fuel to hundreds of branded service stations in Puerto Rico and is a "franchisor" and "distributor" under 15 U.S.C. § 2801(3) and (6).

## IV. JURISDICTION AND VENUE

29. This Court has subject-matter jurisdiction under 15 U.S.C. § 2805(a) and 28 U.S.C. § 1331, without regard to the amount in controversy, and may declare the rights of the parties under 28 U.S.C. §§ 2201–2202.

30. The Court has supplemental jurisdiction over the Puerto Rico-law claims under 28 U.S.C. § 1367(a), because they arise from the same Franchise Agreement and franchise relationship and form part of the same case or controversy.

31. Venue lies in this District under 15 U.S.C. § 2805(a) and 28 U.S.C. § 1391(b), because PRE maintains its offices here, the Station is located here, and the events giving rise to the claims occurred here.

32. This action is timely. It is commenced within one year after the termination, 15 U.S.C. § 2805(a), and within the 30-day period of 15 U.S.C. § 2805(b)(4)(C), which runs from October 9, 2026, the date on which the Notice made the termination effective.

## V. THE FRANCHISE

33. On February 25, 2015, Palmas and Puma Energy Caribe, LLC (now PRE) executed a Puma Franchise Agreement for the operation of the Station (the "Franchise Agreement") (Ex. 2).

34. PRE's own Notice identifies it as the agreement from which the franchise relationship arises: "that certain Puma Franchise Agreement executed on February 25, 2015, including its exhibits, addenda, annexes, and ancillary agreements." Ex. 1, at 1.

35. The Franchise Agreement is the only franchise agreement the parties have signed. It has governed the relationship for more than eleven years.

36. The relationship has the three components of a PMPA franchise: PRE authorizes Palmas to sell motor fuel at the Station under the Texaco brand; PRE supplies the motor fuel that Palmas buys and resells to the public for its own account; and Palmas occupies the Station premises.

37. PRE's invoices to Palmas identify PRE's Texaco business as "[a]n exclusive licensee of Chevron Brands International, LLC." Exs. 6, 12.

38. The Station's underground storage tanks, dispensers and automatic tank gauge are equipment that the Franchise Agreement identifies as PRE's. Ex. 2, § 6.1.16 & Annex B.

39. As part of the franchise, PRE authorizes Palmas to occupy and use the Station premises, and Palmas pays PRE the monthly amount that the Franchise Agreement calls the "*RENTA MENSUAL*." Ex. 2, § 3.1.1 (translation).

40. Under the Franchise Agreement, the possession of the Station remains under Palmas's control, subject only to its performance of its obligations to PRE. Id. § 17.1.2.

41. The Franchise Agreement, with its annexes and addenda, is the parties' entire agreement, and it may be amended only in a writing signed by both parties. Ex. 2, §§ 18.4.1, 18.4.3.

42. Section 3.1.1 provides that, should the parties renegotiate the monthly amount, "*el documento a firmarse para expresar la nueva cuantía será el Anejo A*" (the document to be signed to express the new amount shall be Annex A). Annex A ("*Ajuste de Renta*") remains blank. Id. § 3.1.1 & Annex A (translation).

43. The Notice identifies no writing that changes the monthly amount, and, on information and belief, no such writing exists.

44. Palmas has operated the Station under the Texaco brand, as an independent going concern, since February 2015.

45. The Station is open twenty-four hours a day, seven days a week.

46. Amin Yassin, Palmas's President, has his office at the Station and administers Palmas's business from it.

47. The Station has seven employees, serves approximately 700 customers a day, and also operates a convenience store.

48. PRE audited the Station's convenience store every other month in 2026. Its October 2026 audit gave the store a total score above 95%. Ex. 9.

## VI. THE NOTICE AND THE SUPPLY CUTOFF

49. By letter dated October 9, 2026, signed by its Commercial Director, PRE notified Palmas of the "Immediate Termination" of the franchise relationship (Ex. 1).

50. The Notice states that it was sent "Via Personal Delivery and Certified Mail, Return Receipt Requested." Ex. 1, at 1.

51. Palmas received the Notice by email on October 9, 2026.

52. PRE also sent it by certified mail, no. 9589 0710 5270 3735 5224 24, in an envelope whose postage is dated October 9, 2026.

53. The Postal Service returned that envelope to PRE: its label, dated October 22, 2026, reads "RETURN TO SENDER / NO SUCH NUMBER / UNABLE TO FORWARD / RETURN TO SENDER," and the return receipt bears no signature. Ex. 13.

54. On November 4, 2026, an agent of PRE delivered that envelope by hand to Palmas's personnel at the Station, together with the Notice and the "Revised Summary of Title I" of the Act, and obtained a signature on PRE's "*Acuse de Recibo*." Ex. 13.

55. The Notice invokes four matters.

56. First, it invokes the alleged unavailability of fuel and failure to operate, under 15 U.S.C. § 2802(b)(2)(A), (b)(2)(C) and (c)(9), and Articles 4.1.1, 4.1.2, 4.1.8(4) and 16.1.1(M), (N) and (V) of the Franchise Agreement.

57. Second, it invokes a $22,500 payment claim that PRE has asserted against a separate legal entity, which the Notice deems "attributable to Palmas Fuel Corp." because the two are allegedly "affiliates," under § 2802(c)(8) and Article 16.1.1(L).

58. Third, it invokes an alleged "open repudiation" of regulatory obligations, under § 2802(c)(11) and Article 7, resting solely on a letter dated September 16, 2026.

59. Fourth, as a further reason for immediate rather than 90-day notice, it invokes a payment that, according to the Notice, was returned "on or about August 7, 2026."

60. The Notice states that PRE "has ordered the suspension of all future orders and deliveries to the Premises, effective immediately." It reserves PRE's right to remove Palmas's access to fuel ordering, to close the underground storage tank ("UST") system, and to remove Palmas from brand programs. Ex. 1, at 4–5.

61. The Notice demands surrender of "possession and control" of the Station by October 16, 2026, under threat of "immediate judicial action." It requires Palmas to deliver to PRE the Station's "permits, licenses, certificates, keys, access codes, alarm codes, tank records, environmental records, inventory records, equipment records," and any other materials "reasonably necessary for PRE to recover possession and control of the Station." *Id.* at 5–6.

62. The Notice does not identify who would operate the Station after the surrender.

63. On October 9, 2026, the day of the Notice, PRE delivered to the Station, and invoiced, 2,000 gallons of Diesel (order no. 11452362). Ex. 6.

64. On October 12, 2026, PRE delivered 6,000 gallons of Regular, and no Premium or Diesel, invoiced under the name Puerto Rico Fuel Services, the name under which PRE does business, and collected by direct debit. Ex. 6.

65. PRE then delivered not a single gallon of Palmas's orders of October 14, 15 and 16, 2026—for Regular and Premium and, in the October 16 order, also Diesel.

66. By October 26, 2026, its portal listed all three as "*Cancelada*" (cancelled). Ex. 6.

67. By October 17, 2026, the Station had run out of all motor fuel.

68. On October 21, 2026, PRE's portal refused to let Palmas begin a new order for its account, "Palmas Fuel Corp. – FUELS (6410184)," stating *No hay localización de entrega activo para este cliente*" (no active delivery location for this customer). Ex. 6 (translation).

69. The Notice invokes Article 16.4.1 to suspend supply. That clause permits suspension only "*hasta que se corrija o remedie la falta*" (until the default is corrected or remedied). Ex. 2, § 16.4.1(a).

70. Palmas owes PRE nothing for the fuel it has purchased for the Station. *Infra* ¶ 82.

71. The Station remains open and attended, and its convenience store continues to serve the public.

## VII. PRE'S OCTOBER 15 PROPOSAL AND THE PREMISES

72. On October 15, 2026, PRE met with Mr. Yassin, at PRE's offices, concerning the Station.

73. PRE proposed that Palmas surrender this Station to PRE.

74. PRE offered Palmas no payment for it.

75. Palmas pleads the proposal to show PRE's motive and purpose.

76. At the same meeting, PRE also asked Palmas and Mr. Yassin to surrender a second station, in Gurabo, to PRE.

77. PRE has asserted no claim and has given no notice of termination concerning that station.

78. The Notice demands the operating business itself, including Palmas's cooperation "in the orderly transition," and offers Palmas nothing for the business or its customers. Ex. 1, at 5.

79. On information and belief, PRE holds an option to purchase the real property on which the Station is located, or has agreed to acquire it or has acquired it.

80. A recorded instrument in favor of PRE's predecessor grants PRE a right of first refusal over that property.

81. Palmas is informed by the property owner's representative, the property's administrator, that PRE had purchased the building; the representative so stated to Palmas's personnel on October 14, 2026.

**VIII. THE $22,500 CLAIM IS NOT PALMAS'S**

82. Palmas is current in its payment obligations to PRE under the Franchise Agreement and owes PRE nothing for any fuel PRE has delivered.

83. The $22,500 that the Notice invokes is the amount of a payment claim that PRE sent on September 14, 2026, not to Palmas but to a separate legal entity, concerning Station #017 in Caguas.

84. The claim seeks reimbursement of an administrative fine and fees under a settlement that PRE, the only respondent, entered into with the Puerto Rico Department of Natural and Environmental Resources ("DNER") on June 18, 2026, based on a 2019 inspection of the tank system at Station #017.

85. In that settlement PRE "*ni niega ni acepta*" (neither denies nor admits) the alleged violations, which, by PRE's own account, "occurred in 2019." Ex. 5, cl. *Cuarta* (translation); Ex. 1, at 2.

86. No tribunal has adjudicated that anyone owes PRE that sum, and the entity to which the claim was addressed rejected it in writing on September 16, 2026.

87. Station #017 was operated by Berwin Fuel Corp. ("Berwin"), a corporation separate from Palmas, which was not a party to the DNER proceeding.

88. By an agreement effective June 25, 2024, Ex. 4, cl. *Undécimo*, PRE and Berwin terminated Berwin's franchise by mutual consent, on PRE's own form, signed for PRE by the same officer who signed the Notice.

89. Palmas never guaranteed, assumed or agreed to pay any obligation of Berwin, and nothing in the Franchise Agreement makes Palmas liable for the obligations of any other legal person.

90. The Notice identifies no guaranty, assumption, cross-default clause or other instrument that would make Palmas answerable for the claim.

## IX. PALMAS REPUDIATED NOTHING

91. The September 16, 2026 letter on which PRE relies for its "repudiation" ground concerned Station #017 and was not sent on behalf of Palmas. It states no position of Palmas concerning the Station.

92. Palmas has never stated that it refuses to comply with any law or regulation at the Station.

93. The Notice cites no inspection, notice of violation, citation or agency finding concerning the Station, and identifies no provision of Regulation No. 9035 or of 40 C.F.R. Part 280 that has been violated there.

94. Palmas operates the Station's retail business and its convenience store, and performs the obligations that the Franchise Agreement assigns to it as retailer.

95. The Station's underground storage tanks, dispensers and automatic tank gauge are PRE's equipment, Ex. 2, § 6.1.16 & Annex B, and PRE monitors them remotely. Infra ¶ 100.

96. Annex E of the Franchise Agreement provides that compliance with the EPA consent agreement governing the Station's underground storage tank system "*es y seguirá siendo responsabilidad de la empresa titular de la Estación*" (is and will remain the responsibility of the company that owns the Station) and that the retailer "*no asumió dicha responsabilidad*" (did not assume that responsibility). Ex. 2, Annex E, § 1.1(b) (translation).

## X. THE STATION NEVER CEASED TO OPERATE; PRE'S LISTS ARE WRONG

97. At no time in 2026 was the Station abandoned or closed. It remained open and attended twenty-four hours a day, and, through October 16, 2026, it continued to sell motor fuel to the public.

98. PRE's lists refer to individual fuels.

99. The Notice does not allege that the Station was closed, unattended, or without motor fuel for sale for seven consecutive days, and it attaches no record for any date it lists.

100. PRE monitors the Station's tanks remotely through the automatic tank gauge, which the Franchise Agreement identifies as PRE's equipment, *supra* ¶ 38. Its letters to Palmas attach screenshots, alarm histories and hourly inventory reports printed from PRE's own monitoring system. Ex. 7.

101. PRE's lists are also wrong on their own terms.

102. On each of the four dates on which PRE claims that all three fuels were unavailable—August 6, September 23, October 1 and October 2, 2026—the Station's automatic tank gauge recorded at least one of them in the Station's tanks at the start of the day.

103. On at least the following dates that PRE lists, the tank gauge recorded at the start of the day the very fuel PRE says the Station lacked: Regular—August 5, September 3, September 7, September 23, October 2, October 5 and October 8, 2026; and Premium—April 11, September 23, September 29, October 1 and October 8, 2026.

104. PRE's own monitoring report, attached to its August 20, 2026 letter, shows that Regular never fell below approximately 1,680 gallons on August 5 and 6, 2026—dates on which PRE claims the Station lacked Regular. Ex. 7.

105. PRE controls the supply. It reserved the right to deliver, including at night, "*siete días a la semana, según el horario de entregas de PUMA cambie periódicamente*" (seven days a week, as PUMA's delivery schedule changes from time to time). Ex. 2, § 6.1.10 (translation).

106. Palmas orders through PRE's online portal, under procedures that PRE alone sets and may change. Id. § 6.1.3.

107. Palmas may not sell other brands' products through PRE's equipment, Ex. 2, § 6.1.22, and depends on PRE's deliveries for every gallon it sells.

108. PRE ordinarily accepted Palmas's supplementary orders for a single fuel ("acomodos") and ordinarily delivered Palmas's orders on the day after Palmas placed them.

109. PRE confirmed in writing, to "Palmas Fuel Corp.," order no. 11451397 for 2,000 gallons of Diesel for delivery on October 1, 2026, and order no. 11451972 for 2,000 gallons of Premium for delivery on October 7, 2026.

110. PRE neither delivered nor invoiced either order. Ex. 6.

111. PRE ordinarily does not deliver on Sundays, and it has closed its terminals, or announced "*No entregas*" (no deliveries), on specified holidays. Ex. 10 (translation).

112. Ten of the dates PRE lists fall on a Sunday—February 15, February 22, March 29, April 5, May 24, August 16, September 6, September 13, September 20 and October 4, 2026—five of them within the sixty days before the Notice.

113. PRE's order confirmations state that prices "WILL BE BASED ON THE DATE OF LOADING."

114. PRE, which controls when it loads an order, therefore also controls its price. Ex. 6.

115. The Notice's only seven-day allegation concerns a single fuel, Premium, from October 1 through October 8, 2026.

116. Premium was available and sold at the Station on October 1 and on October 8, the day PRE delivered order no. 11452218, Ex. 6, so no seven consecutive days ran.

117. Within that period, PRE neither delivered nor invoiced the Premium ordered for delivery on October 7. *Supra* ¶¶ 109–110.

118. PRE's lists do not claim that the Station lacked Diesel on any day from October 3 through October 8, or Regular on October 3 or October 6.

119. On 56 of the 75 dates PRE lists, it identifies only one of the three fuels. It lists all three on only four dates—August 6, September 23, October 1 and October 2, 2026—never more than two consecutive days.

120. October 1 and 2 follow PRE's confirmation, and its failure to deliver or invoice, of the Diesel ordered for October 1. Ex. 1, at 2; *supra* ¶¶ 109–110.

121. The Notice itself asserts not seven consecutive days without motor fuel, but a "pattern of recurring interruptions." Ex. 1, at 3.

122. The contract provisions that the Notice invokes do not speak of a single fuel.

123. Section 16.1.1(N) addresses a retailer that, for seven consecutive days or an unreasonable shorter period, "*dejare de vender gasolina o combustible de motor en la ESTACIÓN*" (stops selling gasoline or motor fuel at the Station), "*a no ser que este hecho sea motivado por … cualquier acto imputable a PUMA*" (unless this is caused by … any act attributable to PUMA). Ex. 2, § 16.1.1(N) (translation).

124. Section 16.1.1(M) addresses a station that remains unoccupied, unattended or not operated as a gasoline service station for seven or more consecutive days. Id. § 16.1.1(M).

125. The Notice paraphrases § 16.1.1(N) as requiring Palmas "to avoid failing to operate the Premises as a gas station or to have fuel for sale at the Premises for 7 consecutive days or any

lesser period that is unreasonable under the circumstances," and omits the exception for PRE's own acts. Ex. 1, at 2.

126. The Notice asserts that PRE sent written notifications about product availability dated April 15, April 28, May 6, May 26, June 5, August 20 and September 22, 2026. Ex. 1, at 2.

127. By its own account, therefore, PRE's written notifications began on April 15, 2026, and PRE continued the franchise, supplied fuel and accepted payment throughout.

128. The Notice is dated October 9, 2026; sixty days earlier was August 10, 2026.

129. Of the 75 dates the Notice lists, 44 fall before August 10, 2026.

130. The Notice states that it highlights "in bold and italic the events occurring within 60 days from the date of this Notice," and it highlights no date earlier than August 11, 2026. Ex. 1, at 2 & n.1.

131. By PRE's own designation, every date it lists from January 13 through August 7, 2026, and the payment it says was returned "on or about August 7, 2026," fall outside that period.

132. The Notice does not allege that any sum remains unpaid.

133. Palmas covered that payment within the time the Franchise Agreement allows.

134. The contractual provision that the Notice invokes for the returned payment treats a returned check as a ground for termination only if, after PRE requires payment in cash, the retailer fails to pay within the following twenty-four hours. Ex. 2, § 16.1.1(L).

135. The Notice alleges no such demand and no such failure.

## XI. WHAT THE NOTICE OMITS

136. The Notice likewise invokes Articles 4.1.1, 4.1.2 and 4.1.8(4) as though they required Palmas to keep every fuel in stock. Ex. 1, at 2, 4. They do not.

137. Article 4.1.1 requires the Station to be open "*24 Horas Todos Los Días*" (24 hours every day)—and it is.

138. Article 4.1.2 requires the pumps to be available during operating hours "*a menos que ello no sea posible por razones de seguridad*" (unless that is not possible for safety reasons). Ex. 2, §§ 4.1.1, 4.1.2 (translation).

139. Article 4.1.8(4) concerns the promotion of the brand by keeping the Station open. Id. § 4.1.8(4).

140. No provision of the Franchise Agreement requires Palmas to maintain a minimum inventory of any particular motor fuel.

141. The Notice also omits the procedure the parties agreed upon for those very provisions.

142. For a breach of any provision of Section 4.1, Article 16.1.3 provides that *[s]e le concederán siete (7) días al DETALLISTA luego de la fecha de la notificación escrita, cursada por PUMA para corregir su omisión"* (the retailer shall be granted seven (7) days after PUMA's written notice to cure), and permits termination without an opportunity to cure only *[d]e ocurrir un cuarto incumplimiento*" (upon the occurrence of a fourth breach). Ex. 2, § 16.1.3 (translation).

143. Palmas denies that any event PRE lists breached Section 4.1.

144. In any event, the Notice does not invoke Article 16.1.3 and does not identify any cure period granted, any breach that was cured and then recurred, or any "*cuarto incumplimiento*."

145. PRE knows how much fuel the Station sells, because PRE sells Palmas every gallon.

146. Palmas bought more than 800,000 gallons in 2025.

147. PRE's own certifications record that Palmas bought 786,250 gallons of motor fuel in 2022, 770,000 in 2023, 780,000 in 2024 and 806,002 in 2025—the highest of those four years. Ex. 3.

148. For its premise that Palmas and Berwin are "affiliates," the Notice cites "15 U.S.C. § 2801" without identifying any subsection. Ex. 1, at 1.

149. For its regulatory ground, the Notice asserts that the position it attributes to Palmas "has been expressly rejected by courts confronted with this identical controversy," but cites no court or decision. Id. at 3.

## XII. PRE'S DEMAND FOR "POSSESSION AND CONTROL"

150. Puerto Rico Act No. 3 of March 21, 1978, as amended, provides that a retail gasoline service station "*sólo podrá ser operada por un detallista*" (may be operated only by a retailer). Act No. 3, art. 2(a), 23 L.P.R.A. § 1102.

151. In the June 18, 2026 settlement on which its $22,500 claim rests, PRE told the DNER that Act No. 3 "*prohíbe que un distribuidor-mayorista de gasolina y otros combustibles, opere o entre en actividades que incidan directa o indirectamente sobre la operación de la Estación*" (prohibits a wholesaler-distributor of gasoline and other fuels from operating, or engaging in activities that directly or indirectly bear on the operation of, the Station). Ex. 5, *Acuerdo Transaccional*, at 2 (translation).

152. The Notice nonetheless demands that Palmas surrender "possession and control" of the Station within seven days, and identifies no judicial order or proceeding authorizing it to take possession.

153. The Franchise Agreement provides that the control and direction of Palmas's business and operation, and the possession of the Station, *permanecerán bajo el control del DETALLISTA, sujeto únicamente al cumplimiento por el DETALLISTA de las obligaciones de los contratos entre éste y PUMA*" (shall remain under the retailer's control, subject only to the retailer's performance of its obligations under its contracts with PUMA). Ex. 2, § 17.1.2 (translation).

154. The Notice also demands that Palmas pay "all amounts owed to PRE" through the surrender date. Ex. 1, at 5.

155. Puerto Rico law permits a wholesaler to operate a station directly only provisionally, for no more than ninety days, in limited circumstances, and only after notifying the Office of Monopolistic Affairs in writing of the dates on which that operation will begin and end.

156. The Notice identifies no such circumstance and no such notification.

## XIII. INJURY TO THE GOING CONCERN

157. Palmas is ready and eager to continue buying motor fuel from PRE and selling it to its customers under the Texaco brand.

158. Since PRE suspended its deliveries, Palmas has repeatedly asked PRE to supply motor fuel to the Station, without success. *Supra* ¶¶ 65–68.

159. Every day without PRE's deliveries harms the going concern Palmas has built.

160. PRE's suspension of deliveries has emptied the Station's tanks. Its threatened removal of ordering access, brand programs and the UST system, followed by the surrender PRE demands, would destroy—not merely interrupt—Palmas's operating business, its customer relationships, its employees' jobs and its goodwill. That loss could not be restored by a later damages award.

161. The going-concern value of Palmas's business is not less than $800,000.

162. As a condition of the relief it requests, Palmas undertakes to pay for every delivery by certified check, upon delivery; to continue paying the monthly amount, and any charge PRE collects on the convenience store's sales, under protest and with full reservation of its rights under Counts V and VII, and to tender, under protest, the monthly amount for October 2026 that PRE has not collected; to pay for fuel at the price the Court orders; and to comply with such payment and operational terms as the Court may order pending adjudication.

## XIV. THE MONTHLY AMOUNT

163. Section 3.1.1 of the Franchise Agreement fixes the monthly amount on a sliding scale tied to the Station's monthly volume: $10,000 for up to 79,999 gallons per month, decreasing to $2,000 for 150,000 gallons or more. Ex. 2, § 3.1.1.

164. Palmas's purchases, *supra* ¶¶ 145–147, average about 64,000 to 67,000 gallons a month, within the $10,000 bracket—the highest monthly amount the table provides. Ex. 3.

165. In any month since February 2015 in which Palmas bought 80,000 gallons or more, § 3.1.1 fixed a lower monthly amount—$8,000, $6,000, $4,000 or $2,000, according to the volume—and the excess PRE collected in that month is correspondingly greater. Ex. 2, § 3.1.1.

166. PRE's records of the Station's monthly volumes will establish those months.

167. On August 19, 2022, PRE wrote to Mr. Yassin that changing the Station's brand to Texaco "*requiere firmar una terminación del contrato actual y firmar*" (requires signing a termination of the current agreement and signing) a new one-year Texaco franchise agreement and an "*Acuerdo para uso de Star Mart*" (agreement for the use of Star Mart), and that the monthly amount "*aumentara a $14,000 dólares mensuales, más un cobro de 4% de royalty en las ventas de la tienda Star Mart*" (will increase to $14,000 a month, plus a 4% royalty on the Star Mart store's sales). Ex. 8 (translation).

168. No such agreement was signed.

169. The same day, Mr. Yassin answered PRE: "*Con todo respeto, subir una renta a esto nivel no se puede*" (with all respect, raising the rent to that level is not possible). Ex. 8 (translation).

170. If the Franchise Agreement continues on a month-to-month basis, it allows PRE only to notify Palmas of its intention to increase the monthly amount effective on the expiration date of the original term; if the parties cannot agree on the increase, either party may end the relationship. Ex. 2, § 2.2.3.

171. Palmas and PRE have signed no writing that increases the monthly amount. Ex. 2, § 18.4.3.

172. Since March 2023, PRE has collected $12,000 per month, by direct debit—at least $2,000 a month above the monthly amount that § 3.1.1 fixes, and at least $86,000 from March 2023 through September 2026.

173. No writing signed by both parties, as § 18.4.3 requires, amended the monthly amount. Ex. 2, § 18.4.3.

174. PRE ordinarily collects the monthly amount by ACH between the 20th and the 25th of each month.

175. PRE has not collected the monthly amount for October 2026.

176. Palmas remains ready to pay it, under protest and with full reservation of its rights.

## XV. THE PRICE OF FUEL

177. Section 6.1.14 of the Franchise Agreement fixes the price of the fuel Palmas buys: *el Precio al Detallista establecido por PUMA, que es conocido como el 'LOWEST RACK PRICE' de PUMA recogido en el terminal más una prima*" (the retailer price established by PUMA, known as PUMA's "LOWEST RACK PRICE" picked up at the terminal, plus a premium) of 8.0 cents per gallon for Regular, 9.0 cents for Premium and 10.0 cents for Diesel, plus the taxes and charges permitted by § 6.1.17. Ex. 2, §§ 6.1.14, 6.1.17 (translation).

178. The U.S. Energy Information Administration ("EIA") defines "rack sales" as "[w]holesale truckload sales or smaller of petroleum products where title transfers at a terminal," and "dealer tank wagon (DTW) sales" as "[w]holesale sales of petroleum products priced on a delivered basis to a retail outlet." U.S. Energy Info. Admin., *Petroleum Marketing Monthly*, Glossary.

179. The rack price is thus the terminal price that § 6.1.14 fixes.

180. Under § 6.1.14, PRE's compensation above its lowest terminal price is the agreed premium of 8, 9 or 10 cents per gallon.

181. On information and belief, no written amendment signed by both parties has replaced that term.

182. PRE has stated in this District that it does not use the "Lowest Rack Price" to set its prices.

183. In *C-Fuels, LLC v. Puma Energy Caribe LLC*, Civil No. 19-2057 (MDM), a franchisee whose agreements priced fuel the same way—PRE's "Lowest Rack Price" plus a premium of 8, 9 or 10 cents—sued PRE for overcharging.

184. As the Court described PRE's averments and its interrogatory answers, PRE stated that in 2016 it changed that term in its franchise agreements to "DTW ('Dealer Tank Wagon')" and that "Lowest Rack Price" "is not used by Puma to set prices on any of the business segments to which it commercializes products." ECF No. 87, at 5–6, 10, 19 (D.P.R. Dec. 13, 2021).

185. As the Court also described PRE's position, PRE "has never used a cost structure or variables to calculate a 'Lowest Rack Price,'" although, in its interrogatory answers, "this nomenclature"—which the Court understood to refer to the "Lowest Rack Price" term—"was used on all Puma franchise retail agreements from around 2010 until 2016." *Id.*

186. On information and belief, PRE never obtained Palmas's signature on any amendment of § 6.1.14.

187. PRE reports to the Department of Consumer Affairs ("DACO") the wholesale prices per gallon at which it sells motor fuel.

188. DACO publishes them as the "*Precios Prevalecientes de Mayoristas de Gasolina*," under separate entries that have included "Puerto Rico Energy LLC," "Puma" and "Texaco."

189. DACO publishes no rack price.

190. On information and belief, the price PRE posts with DACO, and invoices to Palmas for the fuel PRE delivers to the Station, is PRE's dealer tank wagon (DTW) price—a delivered price—and not its lowest rack price at the terminal. *Supra* ¶¶ 177–178, 182–185.

191. PRE has invoiced Palmas at the dealer price that PRE posts with DACO for the Station's brand—first Puma, then Texaco—rather than at its lowest rack price at the terminal plus the premium that § 6.1.14 fixes.

192. Each of the following invoiced prices is, to the hundredth of a cent, the price that PRE posted with DACO for that fuel under the Station's brand on the invoice date or, if none was posted that day, on the last date posted before it: invoice no. 1112999 (Nov. 26, 2019), Diesel $2.5570 (Puma, Nov. 23, 2019: 255.70¢); no. 1178127 (Oct. 30, 2020), Regular $1.9948 (Puma, Oct. 30, 2020: 199.48¢); no. 1217155 (Apr. 28, 2021), Regular $2.6953 and Premium $3.0739 (Puma, Apr. 28, 2021: 269.53¢ and 307.39¢); no. 1347840 (Oct. 15, 2022), Regular $3.6037, Premium $4.3041 and Diesel $4.8341 (Puma, Oct. 15, 2022: 360.37¢, 430.41¢ and 483.41¢); no. 1382775 (Mar. 24, 2023), Regular $3.1874 and Premium $3.7363 (Texaco, Mar. 24, 2023: 318.74¢ and 373.63¢); no. 1522441 (Nov. 14, 2024), Diesel $2.9792 (Texaco, Nov. 12, 2024: 297.92¢); no. 1533807 (Feb. 11, 2025), Regular $2.9792 and Premium $3.5470 (Texaco, Feb. 8, 2025: 297.92¢ and 354.70¢); no. 1587380 (Apr. 7, 2026), Regular $4.0580 (Texaco, Apr. 7, 2026: 405.80¢); and no. 1609921 (Oct. 12, 2026), PRE's last invoice before it cut off supply, Regular $4.3419 (Texaco, Oct. 10, 2026: 434.19¢). Exs. 6, 11, 12.

193. The posted price is the price PRE publishes for its brand.

194. On information and belief, and consistent with what PRE stated in *C-Fuels*, *supra* ¶¶ 182–186, it is not a price computed from PRE's lowest rack price at the terminal plus the premium that § 6.1.14 fixes for Palmas.

195. PRE's invoices do not disclose PRE's lowest rack price at the terminal: each states a single unit price per gallon for each fuel, without identifying any terminal price or premium.

196. PRE has also charged Palmas an "Additional Order Fee" of $0.005 per gallon (invoice no. 1558879 (Aug. 21, 2025)), which neither § 6.1.14 nor § 6.1.17 provides. Ex. 12. These allegations are likely to have further evidentiary support after a reasonable opportunity for discovery, including PRE's terminal rack prices, which are within PRE's exclusive control.

197. Palmas has paid every invoice PRE has issued, through October 12, 2026. Exs. 6, 12.

198. Each invoice issued on that basis is a separate breach of § 6.1.14, repeated with every delivery for more than eleven years.

199. Under the Franchise Agreement, no waiver of a claim for any breach is a waiver of any later breach of the same clause. Ex. 2, § 18.1.1.

200. The lowest rack price is a term between PRE and its retailer, fixed by the Franchise Agreement and known only to PRE.

201. Puerto Rico has no refinery and imports all of its petroleum products. U.S. Energy Info. Admin., *Puerto Rico Territory Energy Profile* (updated Jan. 19, 2023).

202. PRE's sources of supply, its costs and its terminal rack prices are within its exclusive knowledge, and the exact overcharge will be established through an accounting.

203. The overcharge can, however, be reasonably estimated.

204. According to the EIA, the average price at which U.S. refiners sold gasoline (all grades) on a DTW basis exceeded their average rack price, excluding taxes, by 32.0 cents per gallon in 2016, 34.8 cents in 2017, 46.6 cents in 2018, 62.1 cents in 2019, 58.0 cents in 2020 and 64.9 cents in 2021—an average of 49.7 cents. U.S. Energy Info. Admin., Refiner Gasoline Prices by Grade and Sales Type (annual).

205. The taxes and charges that § 6.1.17 permits are added to either price alike and do not affect that difference.

206. On information and belief, the dealer price PRE invoiced Palmas exceeded PRE's lowest rack price at the terminal by at least a comparable margin.

207. After deducting the highest premium that § 6.1.14 allows, ten cents per gallon, that margin—approximately 39.7 cents per gallon—applied to Palmas's purchases, which have averaged approximately 785,000 gallons a year, Ex. 3, yields an overcharge reasonably estimated at approximately $312,000 a year and approximately $3,600,000 from February 25, 2015 through October 12, 2026.

208. The actual overcharge may be greater; the estimate does not limit the amount Palmas will prove once PRE produces its terminal rack-price records.

209. That estimate deducts the highest contractual premium for every gallon; it applies the average volume of 2022 through 2025, although Palmas bought more than 800,000 gallons in 2015; and it excludes the order fee described in paragraph 196.

210. The overcharges have drained Palmas's working capital, year after year, for more than eleven years.

## XVI. THE CHARGE ON THE CONVENIENCE STORE'S SALES

211. The Station includes a convenience store that Palmas operates for its own account.

212. The Franchise Agreement contemplates the store, Ex. 2, §§ 7.2.1, 7.6.1, but fixes no charge on its sales: it fixes PRE's compensation as the monthly amount and the premium on the motor fuel PRE supplies. Id. §§ 3.1.1, 6.1.14.

213. Section 7.4.1 requires Palmas to participate in PRE's promotional programs, but *[s]ujeto a las normas, leyes, reglamentos, memorandos y/o cartas circulares aplicables*" (subject to the applicable rules, laws, regulations, memoranda and/or circular letters), and fixes no charge

for them; no memorandum or circular letter is a writing signed by both parties. *Id.* §§ 7.4.1, 18.4.3 (translation).

214. Section 7.4.2, which reserves to PRE the right to change the trademarks of its Products, authorizes no charge on the store's sales. *Id.* § 7.4.2.

215. Since 2023, after PRE changed the Station's brand from Puma to Texaco, PRE has taken from Palmas, by direct debit, 4.5% of the store's monthly gross sales.

216. In 2022, PRE itself told Palmas that the change to the Texaco brand, with a royalty—then proposed at 4%—on the store's sales, required signing new agreements, including an "*Acuerdo para uso de Star Mart*." Ex. 8.

217. On information and belief, no writing signed by both parties provides for a 4.5% charge on the store's gross sales.

218. PRE thus collects a royalty—PRE's own word, Ex. 8—on the sales of a business that PRE does not operate.

**COUNT I — Declaratory Judgment (28 U.S.C. §§ 2201–2202; 15 U.S.C. § 2805(b))**

219. Palmas incorporates paragraphs 1 through 218 above as though fully set forth herein.

220. An actual, justiciable controversy exists.

221. PRE contends that the franchise is terminated, that Palmas must surrender the Station, and that a sum claimed from a separate legal entity is "attributable" to Palmas.

222. Palmas contends the opposite.

223. Palmas is entitled to a declaration that a franchise and franchise relationship exist between Palmas and PRE, governed by 15 U.S.C. §§ 2802–2805.

224. Palmas is entitled to a declaration that the Notice is null and void and did not lawfully terminate the franchise, which remains in effect.

225. Palmas is entitled to a declaration that the $22,500 payment claim described in the Notice is not an obligation of Palmas or a sum to which PRE is "legally entitled" from Palmas, and may not be collected from Palmas or from any sum of Palmas.

226. Palmas is entitled to a declaration that PRE may not suspend supply, take possession of the Station, close the UST system or remove the brand identification on the basis of the Notice.

227. Palmas is entitled to a declaration that, under the franchise, it is entitled to the use and possession of the Station premises, of which PRE may not deprive Palmas except on a ground and with the notice that the PMPA requires, and through judicial proceedings.

**COUNT II — Unlawful Termination (15 U.S.C. §§ 2802, 2805)**

228. Palmas incorporates paragraphs 1 through 227 above as though fully set forth herein.

229. PRE terminated the franchise by the Notice, suspended fuel orders and deliveries, and continues to treat the franchise as terminated.

230. A franchisor may terminate a franchise only on a ground enumerated in 15 U.S.C. § 2802(b) and upon compliance with § 2804.

231. Once the termination is shown, PRE bears the burden of going forward with evidence to establish, as an affirmative defense, that the termination was permitted. 15 U.S.C. § 2805(c).

232. PRE cannot carry that burden on any ground it invoked.

233. Section 2802(c)(8). Palmas owes PRE no sum.

234. The $22,500 claim is asserted against a separate legal entity, concerns a different station, and is disputed and unadjudicated. It is not a sum to which PRE is "legally entitled" from Palmas, the franchisee.

235. Section 2802(c)(9). Before the Notice, the Station never failed to operate the marketing premises. It remained open and attended.

236. PRE's lists concern individual fuels, are wrong on their own terms, and never show seven consecutive days, or any unreasonable shorter period, without motor fuel.

237. Since October 17, 2026, the Station has had no motor fuel to sell only because PRE suspended supply, cancelled Palmas's orders and blocked its access to place them—acts attributable to PRE and beyond Palmas's reasonable control. 15 U.S.C. § 2801(13)(B); Ex. 2, § 16.1.1(N).

238. Any unavailability of a single fuel—which Palmas disputes—was technical or unimportant to the franchise relationship, or beyond Palmas's reasonable control, and therefore not a "failure." 15 U.S.C. § 2801(13).

239. Section 2802(c)(11). PRE identifies no law or regulation violated at the Station, no agency finding and no statement by Palmas.

240. A letter to which Palmas is not a party is not a "knowing failure" of Palmas to comply with any law at the Station.

241. Section 2802(b)(2)(A). PRE identifies no failure by Palmas to comply with a franchise provision that is both reasonable and of material significance.

242. The Section 4.1 provisions PRE invokes are subject to the written notice, seven-day cure period and fourth-breach requirement of Article 16.1.3, which the Notice neither invokes nor shows was followed.

243. The knowledge window. Because PRE gave less than 90 days' notice, it may rely only on events of which it first acquired actual or constructive knowledge on or after August 10, 2026. 15 U.S.C. § 2802(b)(2)(A)(ii), (C)(ii).

244. The payment PRE says was returned and every product-availability date PRE lists before August 10, 2026 fall outside that period.

245. Because PRE monitors the Station's tanks remotely, it acquired at least constructive knowledge of each inventory level when it was recorded.

246. PRE's termination of Palmas on the strength of another entity's disputed debt, its immediate suspension of supply, its demand for "possession and control" of a station it may not operate, and its reliance on lists and contract paraphrases that its own documents contradict constitute willful disregard of the requirements of § 2802 and of Palmas's rights under it. 15 U.S.C. § 2805(d)(1)(B).

247. Palmas's damages include the losses caused by the suspension of supply since October 9, 2026, its lost profits and, should the Station be lost, the going-concern value of its business, not less than $800,000. 15 U.S.C. § 2805(d)(1)(A).

248. The losses caused by the suspension of supply continue to accrue, in an amount to be proven.

**COUNT III — Failure to Comply with the Notice Requirements (15 U.S.C. §§ 2802(b)(1)(A), 2804)**

249. Palmas incorporates paragraphs 1 through 248 above as though fully set forth herein.

250. A termination is permitted only if the notice requirements of 15 U.S.C. § 2804 are met.

251. Notice must be given at least 90 days before the termination takes effect, unless it would not be reasonable to do so. 15 U.S.C. §§ 2802(b)(1)(A), 2804(a)(2), (b)(1).

252. No such circumstances existed.

253. The matters the Notice invokes predate it by weeks, months or years.

254. PRE's written notifications began nearly six months before the Notice, and PRE continued the franchise, supplied fuel and collected the monthly amount throughout.

255. On the very day it declared the termination and the suspension of deliveries "effective immediately," and again three days later, PRE delivered motor fuel to the Station.

256. Section 2804(c)(2) requires that the notice be "posted by certified mail or personally delivered to the franchisee."

257. The Postal Service returned PRE's certified envelope to PRE, and PRE delivered the Notice by hand only on November 4, 2026, twenty-six days after it had made the termination effective and suspended supply. *Supra* ¶¶ 51–54; Ex. 13.

258. PRE bears the burden of going forward with evidence that the termination was permitted, including that these notice requirements were met.

259. A termination effective immediately, with supply cut off the same day, violates 15 U.S.C. §§ 2802(b)(1)(A) and 2804, because 90 days' notice would not have been unreasonable.

260. Palmas is entitled to the relief stated in Count IV and to the damages stated in paragraphs 247 and 248.

**COUNT IV — Preliminary and Permanent Injunctive Relief (15 U.S.C. § 2805(b))**

261. Palmas incorporates paragraphs 1 through 260 above as though fully set forth herein.

262. This Count seeks the remedy that 15 U.S.C. § 2805(b) authorizes for the violations alleged in Counts II and III.

263. Palmas is entitled to preliminary and permanent injunctive relief binding PRE and its officers, agents, servants, employees and attorneys, and all other persons in active concert or participation with any of them who receive actual notice of the injunction, restraining them from: **(a)** giving effect to the Notice, or treating the franchise as terminated on the grounds stated in it; **(b)** taking or seeking possession of the Station other than by motion in this action, or changing its locks or blocking Palmas's access; **(c)** suspending, conditioning or reducing the supply of motor fuel, or withholding delivery of any fuel ordered; **(d)** collecting from Palmas, or from any sum of Palmas's, in any manner, the $22,500 claim described in the Notice, including by debiting it or setting it off against any sum of Palmas's, including deposits, card-transaction settlements, rebates

or incentives, or by making any claim for it on any surety bond issued on Palmas's behalf, or by demanding that Palmas replace or increase any deposit or bond on account of it, or applying any deposit, bond or other sum of Palmas's to any other amount that PRE claims as a result of the Notice or of the termination it declares; **(e)** deactivating or restricting Palmas's access to PRE's fuel-ordering system or to the brand, card and payment programs in which Palmas participated on October 8, 2026; **(f)** closing, locking or altering the underground storage tank system, or erasing, resetting or reprogramming the data of the Station's automatic tank gauge, or disabling, locking or shutting down, remotely or otherwise, the Station's dispensers or its point-of-sale or card-processing equipment; **(g)** removing fuel, pumps, equipment or brand identification, or covering or altering the brand signage; **(h)** installing or appointing a substitute retailer or operator for the Station; **(i)** transferring possession of the Station to a third party; **(j)** requiring Palmas to deliver its permits, licenses, certificates, keys, access codes, alarm codes or records, or to cooperate in any transition, inventory, audit or reconciliation of the Station described in the Notice, or interfering with Palmas's operation of the Station's convenience store or of any other lawful commercial activity at the Station; or **(k)** surrendering, terminating or permitting the termination of PRE's rights over the Station premises, or selling, assigning or otherwise transferring PRE's interest in the premises or in Palmas's franchise, without at least ten days' prior written notice to Palmas and the Court.

264. Nothing in that restraint prevents PRE from invoicing fuel delivered to Palmas and collecting payment for it in the manner the order provides, or from collecting, in the ordinary course, the monthly amount due under Palmas's own Franchise Agreement, subject to Palmas's payment under protest. Nor does it prevent PRE from making a claim on any surety bond issued on Palmas's behalf for an obligation of Palmas itself under its own Franchise Agreement that Palmas does not dispute, on five days' prior written notice to Palmas. Nor does it prevent PRE

from performing routine maintenance, testing, repair or release response, or any action required by law, permit or agency directive, or needed to respond to an emergency or a safety risk, upon written notice as prompt as the circumstances allow to Palmas and the Court, describing the action and its basis; no such action may be based on the Notice or on the grounds stated in it, and, except in an emergency that presents an imminent risk to persons, property or the environment, PRE shall give that notice at least forty-eight hours before taking any action that closes, locks or takes out of service the Station's underground storage tank system or any of its dispensers.

265. PRE may decline or defer a particular delivery only for a specific, identified condition at the Station that prevents safe or lawful delivery, other than a condition based on the Notice or on the grounds stated in it, which it identifies in writing, with its basis, to Palmas and the Court, and it shall make the delivery as soon as that condition ends.

266. Palmas is further entitled to an order requiring PRE, within forty-eight hours, to restore Palmas's access to the fuel-ordering system, including the Station's active delivery location and Palmas's customer account, and to the brand, card and payment programs in which Palmas participated on October 8, 2026, and to deliver all motor fuels—Regular, Premium and Diesel—that Palmas orders, in the quantities ordered, including supplementary single-fuel orders ("acomodos") of the kind PRE accepted before October 9, 2026, up to the available capacity of the Station's tanks shown by its automatic tank gauge, no later than the day after Palmas places each order (or, if that day is a Sunday or a day on which PRE's terminals are closed, on the next day on which PRE delivers), against payment for each delivery by certified check, upon delivery.

267. Each such delivery shall be invoiced at PRE's lowest rack price at the terminal on the loading date plus the premium that § 6.1.14 of the Franchise Agreement fixes (8.0 cents per gallon for Regular, 9.0 cents for Premium and 10.0 cents for Diesel), together only with the taxes and charges that § 6.1.17 permits, stating on each invoice the lowest rack price and the premium

applied; if PRE loads an order after that delivery day, the lowest rack price shall be that of the delivery day.

268. PRE shall send Palmas the invoice for each order by electronic mail when it loads the order, so that Palmas may pay it by certified check upon delivery.

269. Palmas is further entitled to an order confirming that, while the injunction is in effect, Palmas is authorized to continue operating the Station under the Texaco brand, trademarks and trade dress as provided in the Franchise Agreement.

**COUNT V — Breach of Contract (Monthly Amount) (Puerto Rico Law)**

270. Palmas incorporates paragraphs 1 through 269 above as though fully set forth herein.

271. The agreed monthly amount, at the Station's volume, is $10,000. Ex. 2, § 3.1.1.

272. The Franchise Agreement may be amended only in a writing signed by both parties, id. § 18.4.3, and, on information and belief, no such amendment exists.

273. PRE's own August 19, 2022 email tied the increase to $14,000 to new agreements that Palmas would have to sign. Ex. 8.

274. PRE breached § 3.1.1 by collecting $12,000 without any amendment that satisfies § 18.4.3. Civil Code of 1930, Arts. 1044, 1054, 31 L.P.R.A. §§ 2994, 3018.

275. PRE must return the excess it collected—at least $86,000 from March 2023 through September 2026, and continuing to accrue, plus the excess collected in any month in which § 3.1.1 fixed a lower monthly amount, *supra* ¶¶ 163–166—with interest as allowed by law.

276. Palmas is entitled to **(a)** a declaration that the enforceable monthly amount is the amount that § 3.1.1 fixes for the Station's monthly volume—$10,000 at the volumes the Station has recorded—unless the parties agree otherwise in a writing signed by both; **(b)** an order requiring PRE to charge the monthly amount accordingly; **(c)** an accounting of the monthly amount PRE has collected since February 2015; **(d)** judgment for the excess collected, with interest as allowed

by law; and **(e)** pending adjudication, leave to continue paying the monthly amount under protest, without such payment being treated as a waiver, a failure to pay or a ground for termination or nonrenewal.

**COUNT VI — Breach of Contract (Price of Fuel) (Puerto Rico Law)**

277. Palmas incorporates paragraphs 1 through 276 above as though fully set forth herein.

278. PRE breached § 6.1.14 with every invoice by charging Palmas a base price other than, and higher than, its lowest rack price at the terminal plus the agreed premium. Civil Code of 1930, Arts. 1044, 1054, 31 L.P.R.A. §§ 2994, 3018.

279. Palmas's damages are the amounts PRE charged in excess of the agreed price from February 25, 2015 through October 12, 2026, with interest as allowed by law—reasonably estimated at approximately $312,000 a year and $3,600,000 in all, subject to applicable law. *Supra* ¶¶ 203–209.

280. PRE further breached § 6.1.14 by adding to the price the order fee described in paragraph 196.

281. Palmas is entitled to **(a)** a declaration that § 6.1.14 governs the price of the fuel PRE sells Palmas; **(b)** specific performance, by an order requiring PRE to invoice every purchase at its lowest rack price at the terminal plus the agreed premium, together only with the taxes and charges § 6.1.17 permits; **(c)** an accounting of every purchase since February 25, 2015; **(d)** judgment for the difference and for that fee, with interest as allowed by law; and **(e)** pending adjudication, a preliminary injunction requiring PRE to invoice every purchase at its lowest rack price at the terminal plus the agreed premium, together only with the taxes and charges § 6.1.17 permits, and to state on each invoice the lowest rack price and the premium applied.

**COUNT VII — Breach of Contract (Charge on Convenience-Store Sales) (Puerto Rico Law)**

282. Palmas incorporates paragraphs 1 through 281 above as though fully set forth herein.

283. PRE breached the Franchise Agreement, which provides no charge on the convenience store's sales and may be amended only in a writing signed by both parties, by imposing and collecting a 4.5% charge on those sales. Ex. 2, § 18.4.3; Civil Code of 1930, Arts. 1044, 1054, 31 L.P.R.A. §§ 2994, 3018.

284. Palmas is entitled to **(a)** a declaration that the Franchise Agreement does not entitle PRE to any percentage of the convenience store's sales; **(b)** an order requiring PRE to cease debiting that charge; **(c)** an accounting of every such charge since 2023; **(d)** judgment for the amounts collected, in an amount to be proven, with interest as allowed by law; and **(e)** pending adjudication, leave to pay any such charge under protest, without such payment being treated as a waiver, a failure to pay or a ground for termination or nonrenewal.

## PRAYER FOR RELIEF

**WHEREFORE**, Palmas respectfully requests that the Court:

**(a)** DECLARE the rights of the parties as set forth in Paragraphs 223 through 227, including that PRE may not collect the $22,500 claim, in any manner, from Palmas, from any sum of Palmas, or from any surety bond issued on Palmas's behalf—that claim being a matter between PRE and the separate legal entity to which PRE addressed it, which retains its own defenses; and ORDER PRE to return to Palmas, with interest as allowed by law, any sum collected from Palmas, set off against any sum of Palmas, or obtained from any bond issued on Palmas's behalf, on account of that claim (Count I);

**(b)** ENTER a temporary restraining order and preliminary and permanent injunctive relief under 15 U.S.C. § 2805(b) and Fed. R. Civ. P. 65, binding PRE and, under Fed. R. Civ. P. 65(d)(2), all persons in active concert or participation with it who receive actual notice, as set forth in Paragraphs 263 through 269, including the order restoring Palmas's ordering access and requiring delivery of all motor fuels within the time and at the lowest rack price plus the agreed

premium set forth there, and CONFIRMING Palmas's authorization to operate the Station under the Texaco brand, trademarks and trade dress while the relief is in effect (Counts II–IV);

**(c)** AWARD actual damages under 15 U.S.C. § 2805(d)(1)(A), including the losses caused by the suspension of supply since October 9, 2026, lost profits, and the loss of the going-concern value and goodwill of Palmas's business should the Station be lost, which is not less than $800,000; exemplary damages under § 2805(d)(1)(B); and reasonable attorney and expert-witness fees under § 2805(d)(1)(C), without duplication (Counts II–III);

**(d)** DECLARE that the Franchise Agreement continues on its own terms and that the enforceable monthly amount is the amount § 3.1.1 fixes for the Station's monthly volume—$10,000 at the volumes the Station has recorded—unless the parties agree otherwise in a writing signed by both; ORDER PRE to invoice the monthly amount accordingly and to account for the monthly amount invoiced and collected and the Station's monthly volumes; ENTER judgment for the excess collected, with interest as allowed by law; and, pending adjudication, AUTHORIZE Palmas to continue paying the invoiced monthly amount under protest or, under Fed. R. Civ. P. 67, to pay $10,000 a month to PRE and deposit the disputed difference into the registry of the Court, without either course being treated as a waiver, a failure to pay, or a ground for termination or nonrenewal (Count V);

**(e)** DECLARE that § 6.1.14 governs the price of the fuel PRE sells Palmas; ORDER PRE specifically to perform § 6.1.14 by invoicing every purchase at its lowest rack price at the terminal plus the agreed premium, together only with the taxes and charges § 6.1.17 permits; ORDER PRE to account, for every purchase since February 25, 2015, for the base price charged, its lowest rack price at the terminal on the date of the purchase, and the premium, taxes and charges applied, and to produce its terminal rack-price records; ENTER judgment for the difference, reasonably estimated at approximately $3,600,000, and for the order fee described in paragraph

196, with interest as allowed by law; and, pending adjudication, ORDER PRE to invoice every purchase at its lowest rack price at the terminal plus the agreed premium, together only with the taxes and charges § 6.1.17 permits, and to state on each invoice the lowest rack price and the premium applied (Counts IV and VI);

**(f)** DECLARE that the Franchise Agreement does not entitle PRE to any percentage of the convenience store's sales; ORDER PRE to cease debiting that charge and to account for every such charge since 2023; and ENTER judgment for the amounts collected, with interest as allowed by law; and, pending adjudication, AUTHORIZE Palmas to pay any such charge under protest, without such payment constituting a waiver, a failure to pay, or a ground for termination or nonrenewal (Count VII); and AWARD Palmas, under Article 1054 of the Civil Code of 1930, all other damages caused by PRE's breaches of the Franchise Agreement alleged in Counts V through VII;

**(g) SET any security** under 15 U.S.C. § 2805(b)(3) and Fed. R. Civ. P. 65(c) at $1,000, to be deposited in cash with the Clerk of Court, in light of Palmas's payment for every delivery by certified check, upon delivery;

**(h) SET the preliminary**-injunction hearing at the Court's earliest availability; AUTHORIZE expedited discovery for that hearing; and ORDER PRE to preserve all documents and electronically stored information concerning Palmas and the Station since January 1, 2026, and all records since February 25, 2015 of the base prices it has charged Palmas, of its terminal rack prices, and of the gallons Palmas purchased, by product and year, including its annual gallonage certifications;

**(i) AWARD pre-judgment** and post-judgment interest, including interest as allowed by Puerto Rico law and interest under 28 U.S.C. § 1961; costs; and, as to Counts V through VII, attorney's fees and interest for obstinacy under P.R. R. Civ. P. 44.1(d) and 44.3(b); and

**(j) RETAIN** jurisdiction to enforce the relief granted, and GRANT Palmas any other relief, legal or equitable, to which it is entitled, even if not expressly requested in this pleading. Fed. R. Civ. P. 54(c).

## JURY DEMAND

Palmas demands a trial by jury on all issues so triable. The Franchise Agreement contains no waiver of trial by jury, and the terms printed on PRE's unsigned invoices are not part of the franchise, which may be amended only by a writing signed by both parties. Ex. 2, § 18.4.3. Palmas acknowledges that, under 15 U.S.C. § 2805(d)(2), the question of exemplary damages is reserved to the Court.

**RESPECTFULLY SUBMITTED.**

**I HEREBY CERTIFY** that on this date I electronically filed the foregoing with the Clerk of Court using the CM/ECF system. Because Defendant Puerto Rico Energy, LLC has not yet appeared in this action, I further certify that on this same date, to give Defendant actual notice under Fed. R. Civ. P. 65, I sent a true and complete copy of the foregoing, with its exhibits, to Defendant by electronic mail addressed to its outside counsel, Lee R. Sepulvado-Ramos, Esq. Defendant will be formally served with the summons and this Verified Complaint in accordance with Fed. R. Civ. P. 4.

In San Juan, Puerto Rico, this 6th day of November, 2026.

***s/ Andrés C. Gorbea-Del Valle***
ANDRÉS C. GORBEA-DEL VALLE
USDC-PR No. 226313
P.O. Box 195191
San Juan, PR 00919
Tel. (787) 217-2234
Email: andres_gorbea@yahoo.com

*Counsel for Plaintiff Palmas Fuel Corp.*

## VERIFICATION

I, Amin Yassin, declare under penalty of perjury under the laws of the United States (28 U.S.C. § 1746) that I am the President of Palmas Fuel Corp., the plaintiff herein, and am authorized to make this verification on its behalf; that I have read the foregoing Verified Complaint, or have had it translated to me into Spanish, and I understand it; and that the factual allegations therein are true and correct of my own personal knowledge or based on the business records of Palmas Fuel Corp. kept in the ordinary course of business, except **(a)** those matters expressly stated on information and belief; **(b)** matters expressly stated to be based on documents, public records, court or administrative filings or records reviewed, as to which I believe the document or record states what is alleged; and **(c)** allegations concerning the knowledge, intent, motive, or good or bad faith of Defendant or third parties, Defendant's internal records and its dealings with third parties and government agencies, all of which I state on information and belief, except that any statement made directly to me by Defendant is within my personal knowledge.

Executed in Puerto Rico on November 6, 2026.

AMIN YASSIN
President, Palmas Fuel Corp.